**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SAMANTHA LAGUE,<br><br>Plaintiff,<br><br>v.<br><br>OLIVIA FORSGREN and ERIC FORSGREN,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Samantha LaGue ("Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants Eric Forsgren and Olivia Forsgren and alleges as follows. Plaintiff resides at 3279 Harris Court, Dover, New Jersey 07801-1400. Defendants Eric and Olivia Forsgren reside, upon information and belief, at 6173 Walking Stick Way, Fort Benning, Georgia 31905-7903.

**PRELIMINARY STATEMENT**

1. This action arises from a personal conflict that escalated into an anonymous campaign to discredit Samantha LaGue before her employer, military command, and the New Jersey school community in which her children participate.

2. Samantha and Defendants Eric and Olivia Forsgren were once close family friends in the community surrounding Picatinny Arsenal, a New Jersey military installation.

3. This close relationship fractured amid a build-up of resentment and several escalating disputes between the families. The Forsgrens repeatedly involved military, law-enforcement, and community authorities in accusations directed at Ms. LaGue and her family. The campaign culminated on January 28, 2026, when an anonymous sender calling itself "The

Whistleblower Times" circulated a defamatory email to community and military officials whose decisions could directly affect Ms. LaGue's career, family, and community standing.

4. This email falsely accused Ms. LaGue of criminal conduct, endangering children through drugs and alcohol, and even made accusations concerning gun threats by her children. The email invoked child-abuse reporting laws as an excuse for sharing such extensive false accusations and used a stale court-record screenshot to portray Ms. LaGue as having a present criminal record. The email threatened escalation to local and national media.

5. These accusations were not an innocent inquiry into child safety. They were a targeted attempt to subject Samantha to official scrutiny and destroy her credibility as an upstanding member of her close-knit community.

6. The sender concealed their identity behind an anonymous Proton Mail account. To uncover the source of these false accusations, Ms. LaGue retained a forensic investigator and instituted two pre-action disclosure proceedings in New York. Internet provider records she obtained from a linked social media account ultimately traced to the Forsgrens' household internet account, registered to Eric Forsgren and listing Olivia Forsgren's telephone number.

7. Based on this forensic evidence and evidence obtained through court-ordered subpoena, the subject matter of the email, and its connection to the parties' personal history, upon information and belief, one or both Defendants created, materially assisted in preparing, authorized, directed, or transmitted the anonymous email.

8. The anonymous email appeared months after Ms. Forsgren and Ms. LaGue entered into an August 13, 2025 Settlement Agreement to resolve a municipal proceeding between them and to restrict disparagement of one another. The email renewed and escalated the very personal attacks the parties had agreed to end, and constitutes a violation of that agreement.

9. The email caused substantial reputational and professional harm, severe emotional distress, and medical and psychiatric expenses. Ms. LaGue seeks monetary damages, punitive damages where authorized, and enforcement of Ms. Forsgren's contractual promises, together with the costs and attorneys' fees recoverable under the Agreement.

**PARTIES**

10. Plaintiff Samantha LaGue is a natural person residing in New Jersey and is a citizen of New Jersey. She is a civilian employee of the United States Department of the Interior, Fish and Wildlife Service, and has served as a GS-13 section chief and federal contracting professional.

11. Defendant Eric Forsgren is a natural person and United States Army officer. Upon information and belief, he resides with Defendant Olivia Forsgren, a natural person, at 6173 Walking Stick Way, Fort Benning, Georgia 31905-7903.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff alleges damages exceeding $75,000, exclusive of interest and costs, and diversity of state citizenship between Plaintiff and all Defendants.

13. This Court has specific personal jurisdiction over each Defendant who participated in the challenged publication under New Jersey's long-arm statute and the Due Process Clause of the United States Constitution.

14. Upon information and belief, one or both Defendants deliberately directed the January 28, 2026 communication into New Jersey, not merely to Plaintiff as a New Jersey resident, but to known and identifiable New Jersey-based school officials, PTA and educational

personnel, and Picatinny Arsenal officials, concerning a New Jersey school program and purported child-safety issues in New Jersey.

15. The communication identified New Jersey locations, Dennis B. O'Brien Elementary School and Picatinny Arsenal, invoked New Jersey's mandatory child-abuse reporting statute as a pretext for the communication, requested investigation and official action by the addressed New Jersey institutions, and attached a New Jersey municipal-court record.

16. These contacts arose from the sender's own purposeful conduct directed at New Jersey and are the conduct from which the defamation and related tort claims arise. Plaintiff further alleges that Defendants knew that publication to those New Jersey recipients would cause substantial reputational injury in the New Jersey school, military, and community settings at which the accusations were expressly aimed.

17. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and omissions giving rise to the claims occurred in New Jersey, including the purposeful distribution of the challenged email to New Jersey school and military recipients, its focus on the Dennis B. O'Brien Elementary School and the Picatinny Arsenal Month of the Military Child program, and its use of a New Jersey municipal-court record to prompt action in New Jersey.

18. The claims concern acts expressly aimed at New Jersey institutions and persons, not merely injuries experienced by Plaintiff at her residence in New Jersey.

## FACTUAL ALLEGATIONS

### A. The Former Friendship and the 2024 Military Incident

19. The LaGues and the Forsgrens became close friends in the Picatinny Arsenal military community in 2023. The adults socialized regularly, attended military functions and gatherings together, exchanged informal and joking messages, and brought their children

together at school and community events. Their relationship involved considerable personal familiarity and mutual trust. The Forsgrens remained socially close to Jacob and Samantha LaGue well after a January 2024 incident that later became a central point of conflict.

20. On January 11, 2024, at a military social event, Jacob LaGue briefly smacked Olivia Forsgren's buttocks during a gathering. Ms. Forsgren raised the incident with Ms. LaGue the following day, describing embarrassment and stating that she believed Mr. LaGue had been joking. Ms. LaGue apologized for the embarrassment, and Mr. LaGue apologized directly to Ms. Forsgren on January 17, 2024, which she warmly accepted. For months afterward, both families continued their friendship and social interactions. The later portrayal of this event as a sexual assault became a source of escalating conflict between the families.

21. When Jacob LaGue received a military assignment sought by Eric Forsgren, tensions intensified, and resentment and jealousy concerning Mr. LaGue's professional advancement fueled a continued breakdown in the friendship.

22. In February 2025 Eric Forsgren brought the January 2024 incident to the attention of senior military personnel, setting in motion military involvement. Eric gave a statement to Army Criminal Investigation Division on February 26, 2025. On March 21, 2025, the Army Office of Special Trial Counsel referred the matter for command rather than criminal disposition. A Letter of Reprimand was issued on April 4, 2025, and Jacob LaGue submitted a detailed written rebuttal. No criminal charges followed.

23. The parties' acrimonious break and these military proceedings supply the backdrop for accusations later made against the LaGues, which form the basis for this action.

24. Through the families' former close friendship, Defendants were intimately familiar with the LaGues' professional positions, their children's school, their community relationships, and the individuals holding positions of authority within those institutions.

25. Thus, Defendants had firsthand knowledge of precisely whom to contact and what allegations would be most damaging to the LaGues' personal and professional reputations, employment, family relationships, and emotional well-being.

26. The January 28, 2026 anonymous email exploited the intimate knowledge that the sender could have only acquired through a close relationship with the LaGues—directing serious accusations to individuals whom Defendants knew held positions of authority and influence over the LaGues' lives, with the intent to maximize harm.

**B. The 2025 Reports, Community Encounters, and Municipal Resolution**

27. Beginning in approximately February 2025, following the deterioration of the families' friendship, Olivia Forsgren repeatedly sought intervention from military authorities, local law-enforcement agencies, and school personnel concerning Samantha LaGue and her family. These complaints extended beyond the January 2024 incident involving Jacob LaGue and increasingly concerned Samantha LaGue's ordinary interactions and attenuated contacts with Olivia in the school and military communities.

28. Among other actions, Ms. Forsgren sought a military protective or no-contact order nominally directed at Jacob LaGue, although a military official reportedly acknowledged that the restriction was sought principally because of Ms. Forsgren's reports about Samantha LaGue.

29. Ms. Forsgren also raised complaints with the military Inspector General concerning her perceived exclusion from the military-spouse community, which she attributed to

Ms. LaGue. Ms. Forsgren thereafter reported additional alleged incidents involving Ms. LaGue and her family to local authorities, including Rockaway Township and Picatinny Arsenal law enforcement.

30. On March 28, 2025, Olivia Forsgren submitted an incident report to Rockaway Township authorities concerning Ms. LaGue's presence at Dennis B. O'Brien Elementary School. Ms. LaGue had entered the school to attend a previously scheduled meeting involving her son. Nevertheless, Ms. Forsgren characterized Ms. LaGue's presence and movements near Olivia, including merely looking in her direction, as conduct warranting a report to law enforcement.

31. On or about April 4, 2025, Ms. Forsgren attributed to Ms. LaGue's minor son statements that he was "not allowed to be around" Ms. Forsgren and "feared for his safety." Ms. LaGue disputes that her son ever made those statements, and both the child and school principal Gaetano Sollazzo subsequently denied that he had done so.

32. On April 5, 2025, Olivia Forsgren filed yet another incident report concerning Ms. LaGue's ordinary movements at a children's baseball game. Ms. Forsgren characterized Ms. LaGue's approach toward bleachers on which she was sitting as suspicious or intimidating, despite the fact that Ms. LaGue was merely using the only paved walkway providing access to the bleachers, restroom, and concession stand while attending the game. Nothing about Ms. LaGue's conduct objectively suggested a threat, intimidation, or other misconduct. This incident exemplifies Ms. Forsgren's escalating pattern of construing entirely innocuous, normal conduct as threatening towards her, and transforming routine encounters into "incidents" warranting official intervention.

33. Throughout early 2025, Ms. Forsgren continued filing incident reports that distorted Ms. LaGue's innocuous conduct into supposed acts of harassment or violations, despite the absence of any objectively threatening behavior. This escalating pattern of baseless accusations was compounded by Eric Forsgren's increasingly intimidating conduct toward Ms. LaGue and her family.

34. During April and May 2025, Eric Forsgren repeatedly engaged in conduct Ms. LaGue perceived as physically intimidating at Dennis B. O'Brien Elementary School, Peterson Field, and a community "Take Back the Night" event. These encounters included deliberately approaching Ms. LaGue at close range, sustained staring, and photographing or recording the LaGues. Several incidents were witnessed by third parties or documented through contemporaneous photographs and video recordings.

35. Ms. Forsgren additionally sought information concerning Ms. LaGue's activities and whereabouts through another parent involved in the children's youth baseball program. Ms. LaGue subsequently learned of those efforts through communications with members of the school and parent community.

36. In or around May 2025, Eric Forsgren told a government civilian employee that he maintained a "file" concerning the LaGues and added information to it almost daily. The employee subsequently relayed Mr. Forsgren's statement to Jacob LaGue, confirming that Mr. Forsgren was actively compiling information concerning the family. This revelation, considered alongside Defendants' repeated complaints, inquiries through third parties, and encounters with Ms. LaGue, substantially intensified her fear that Defendants were systematically monitoring her family's activities and exacerbated the emotional distress she was already experiencing.

**C. The Dismissed Harassment Complaint and Settlement Agreement**

37. Eventually, Olivia Forsgren filed a citizen's harassment complaint against Samantha LaGue in Rockaway Township Municipal Court, captioned *State of New Jersey v. Samantha LaGue*, No. 1435-S-2025-000064.

38. On August 13, 2025, Samantha LaGue and Olivia Forsgren executed a Confidential Settlement Agreement (the "Agreement"). Under the Agreement, Olivia agreed to seek dismissal with prejudice of her complaint against Ms. LaGue, and the municipal proceeding was subsequently resolved. Ms. LaGue performed her obligations under the Agreement.

39. On August 13, 2025, a judge ordered the charge be dismissed and expunged during a proceeding both Ms. Forsgren and Ms. LaGue attended. By the end of the day on August 13, 2025, the record of that proceeding had been removed from online records.

40. Paragraph (a) of the Agreement prohibits either party from making "any public expression, publication, or communication of any nature, orally or in writing, including electronically and on any social media website or application, that is defamatory, disparaging, critical, and/or unfavorable with respect to the other Party," subject to express exceptions for private conversations and communications and statements in military, legal, or judicial proceedings.

41. Paragraph (b) separately forbids either party to "instruct, request, seek or in any way elicit any third party" to make such remarks about the other, "whether public or private."

42. Paragraph (d) allows an aggrieved party to seek "judicial recourse, including the award of attorneys' fees and costs."

43. The Agreement is governed by New Jersey law and memorializes the parties' consent to jurisdiction in the Superior Court of New Jersey, Morris County, for enforcement. It does not require that enforcement occur exclusively there.

**D. School and Community Contacts Immediately Prior to the Email**

44. On October 21, 2025, after a PTA meeting, Erica Acevedo identified herself to PTA President Shannon McGroarty and Vice President Christina Erickson as Olivia Forsgren's friend and announced that she would take over as chair of the Month of the Military Child ("MOTMC") program. At that time, Samantha LaGue already held that position, as the PTA officers immediately made clear to Ms. Acevedo.

45. Ms. Acevedo's actions appeared to be an effort to oust Samantha LaGue from an important community role, which, upon information and belief, were directed by Olivia Forsgren.

46. On January 24, 2026, four days before the anonymous email was sent, Olivia Forsgren contacted PTA President McGroarty directly, asserting that she had MOTMC contacts at Picatinny Arsenal who were reaching out to her, and asked to connect with the "new chair" of the program. McGroarty did not respond. The anonymous email, sent days after these odd communications, focused on Samantha LaGue's position as chair of that same MOTMC program.

**E. The January 28, 2026 Proton Mail Publication**

47. On January 28, 2026, at 12:43 p.m., the anonymous email address thewhistleblowertimes@proton.me sent an email bearing the subject "[EXTERNAL] Media Inquiry: MOTMC Chair, Mandatory Reporting, Safety Oversight," and signed "The Whistleblower Times" (the "Defamatory Email"). A true copy is attached as **Exhibit A**.

48. The Defamatory Email specifically named Samantha LaGue and identified her position as the MOTMC chair, her employment at the U.S. Fish and Wildlife Service, and her residence at Picatinny Arsenal.

49. The Defamatory Email was sent to senior Army personnel, New Jersey school and PTA-related officials, and four attorneys at the Department of the Interior Office of the Solicitor, including John Reim, Craig Bonham, Paulo Aquiles, Gaetano Sollazzo, Dr. Richard Corbett, Scott Currie, Rebecca Wilson, James Robertson, and Jack Ko. The sender selected individuals whose roles made them capable of initiating scrutiny of Samantha or adversely affecting her employment and school-community standing.

50. The Defamatory Email purported to speak for "multiple concerned parents and families" of Dennis B. O'Brien Elementary School and Picatinny Arsenal. It stated that Samantha "is alleged to have prior criminal harassment charges in the State of New Jersey (see attached)." Attached was a screenshot of a municipal court-search record displaying Samantha's case as "Active," even though the proceeding had been resolved months earlier and the record was expunged and no longer accessible through online search. The obsolete screenshot was used to create the false impression of an ongoing criminal matter.

51. The Defamatory Email also claimed Jacob "has allegedly received U.S. Army punishments for sexual assault and abuse of prescription drugs"; that "the Lagues' children may be exposed to environments involving alcohol abuse and marijuana gummies"; and that one child "has allegedly threatened to bring a gun to school."

52. The claim that Jacob had received Army punishment for sexual assault was false. In fact, the Army Criminal Investigation Division did not close its investigation until April 2026, months after the Defamatory Email was sent.

53. The reference to prescription-drug abuse was false, the claim about marijuana gummies was invented, and the purported firearm threat never occurred. These charges associated Samantha and her household with criminality, substance misuse, danger to children, and threats of school violence.

54. The sender expressly raised doubts about Samantha LaGue's "suitability for roles involving children," called on school and command officials to consider mandatory reporting, and asserted that officials may be complicit or negligent if they failed to act. The Defamatory Email was designed to provoke investigation of the LaGues, challenge Samantha's selection as program chair for the MOTMC, and damage her credibility with her federal employer and community.

55. Despite claiming its information "ha[d] not been independently verified," the sender invoked N.J.S.A. 9:6-8.10 and Department of Defense child-protection procedures, demanded a response, and threatened to distribute the accusations to local and national news outlets within five business days.

56. Under the guise of a neutral "media inquiry," the sender deliberately targeted Samantha LaGue with serious, damaging accusations and threatened broader public dissemination of the accusations unless the recipients took action against Ms. LaGue, revealing that the communication's true purpose was not legitimate reporting, but to provoke official scrutiny and inflict maximum reputational, professional, and personal harm under the pressure of an impending deadline.

57. The Defamatory Email's repeated use of qualifiers such as "allegedly," "parents have communicated," and "if accurate" did not diminish the defamatory nature of its accusations. The communication purported to rely on reports from multiple concerned parents and

corroborating records, specifically identified Samantha LaGue and her professional and community roles, and demanded immediate official action based on supposed evidence of criminal misconduct and threats to child safety. By presenting these accusations as credible reports warranting immediate investigation and intervention, the sender conveyed to recipients that there was a legitimate factual basis to suspect Samantha of serious misconduct, notwithstanding the email's superficial disclaimers of independent verification.

58. Upon information and belief, the purported parental reports and corroborating evidence did not exist, and the sender fabricated these supposed sources to lend credibility to knowingly false accusations. Plaintiff further alleges that the sender's deliberate concealment of the alleged sources was intended to prevent scrutiny of the accusations while inducing recipients to act.

59. To the extent any such third-party reports actually existed, Plaintiff intends to identify their sources through discovery and pursue appropriate relief against any individuals responsible for knowingly originating or disseminating the false allegations.

60. Samantha LaGue had not committed criminal harassment, did not expose children to marijuana gummies or unlawful drug activity, and had not endangered any child.

61. The school firearm accusation is unequivocally false and based on no tangentially related conduct.

62. The municipal complaint referenced in the Defamatory Email was not active when the message was circulated.

63. In response to the Defamatory Email, Plaintiff obtained two negative drug tests to preemptively protect her reputation and job and prove that the statements carried no truth.

64. Principal Gaetano Sollazzo of Dennis B. O'Brien Elementary School confirmed in writing that the false allegation of a school gun threat had not occurred, and that PTA representatives did not originate the claimed reports from multiple concerned families.

65. Picatinny Arsenal's public-affairs and family-advocacy personnel had no knowledge of these allegations prior to the Defamatory Email.

**F. The Pre-Action Proceedings and Attribution Evidence**

66. After receiving the Defamatory Email, Samantha LaGue retained a cyber-forensic investigator to identify the individual or individuals responsible for its anonymous transmission.

67. The investigator identified an online presence operating under the same "The Whistleblower Times" persona used in the Defamatory Email, and identified that there was likely a since-deleted Instagram account and an X (formerly Twitter) account associated therewith.

68. The X account, which listed the email address thewhistleblowertimes@proton.me in its biography, purported to be a Washington, D.C.-based news organization. However, upon review, it has published no original reporting. Instead, the account made a mere twelve posts, most reposts of other accounts, between January 13 and February 5, 2026, and has no prior or subsequent activity. Several posts occurred on the same date as the Instagram login later traced to the Forsgrens' household. Its last post immediately followed the five-business-day response deadline in the Defamatory Email.

69. Although the investigator established a connection between the anonymous email address and these social-media accounts, publicly available information was insufficient to identify the individuals operating them. Accordingly, Samantha was forced to seek judicial intervention to obtain non-public account and subscriber records necessary to trace the anonymous publication to its source.

70. Through counsel, Samantha commenced two successive pre-action disclosure proceedings in the Supreme Court of the State of New York, New York County, pursuant to CPLR § 3102(c). The first, *LaGue v. Meta Platforms, Inc., et al.*, Index No. 153163/2026 (the "Meta Proceeding"), sought disclosure of identifying account information and access records from Meta Platforms, Inc. ("Meta") and X Corp. concerning any Instagram and X accounts linked to the Proton Mail email address.

71. The second, *LaGue v. Charter Communications, Inc., et al.*, Index No. 157542/2026 (the "Spectrum Proceeding"), was commenced after information obtained through the Meta Proceeding identified an internet protocol ("IP") address used to access the associated Instagram account. The Spectrum Proceeding sought to identify the internet-service subscriber assigned that IP address at the relevant time.

72. In response to process issued in the Meta Proceeding, Meta produced records identifying a specific Internet Protocol Version 6 ("IPv6") address associated with a January 16, 2026 login to the Instagram account linked to the Proton Mail address used to transmit the Defamatory Email. Plaintiff's counsel traced that IPv6 address to Charter Communications, Inc., doing business as Spectrum ("Spectrum"), which provided internet service associated with the IPv6 address at the relevant time. Because Meta's records identified the network connection used to access the Instagram account but did not identify the individual subscriber or user, Samantha commenced the Spectrum Proceeding to obtain that information.

73. Pursuant to a subpoena issued in the Spectrum Proceeding, Spectrum produced subscriber records identifying Eric Forsgren as the subscriber assigned the exact IPv6 address recorded by Meta for the January 16, 2026 Instagram login. Spectrum's records identified the associated service and billing address as 6173 Walking Stick Way, Fort Moore, Georgia, listed

the subscriber email address as ericforsgren1@gmail.com, and included a telephone number known to be associated with Olivia Forsgren.

74. Accordingly, the evidence obtained through the two pre-action proceedings establishes a direct, traceable connection between the anonymous publication and the Forsgrens' household: (i) the Defamatory Email originated from a Proton Mail address associated with "The Whistleblower Times"; (ii) the same persona and identifying information were linked to an Instagram account; (iii) Meta's records identified the IPv6 address used to access that Instagram account on January 16, 2026, just twelve days before the Defamatory Email was sent; and (iv) Spectrum's subscriber records established that the identified IPv6 address was assigned to an internet account registered to Eric Forsgren at the Forsgrens' residence, with contact information also associated with Olivia Forsgren.

75. Thus, the records obtained through judicial process trace access to an online account connected with the Defamatory Email directly to the Forsgrens' household.

76. The subscriber and account-access records, considered together with the Defamatory Email's highly specific targeting of Samantha LaGue's school, military-community, and federal-employment relationships; its use of information concerning the parties' prior municipal proceedings; and Defendants' preceding conduct toward the LaGues, support the reasonable inference that, upon information and belief, one or both Defendants authored, prepared, contributed to, authorized, directed, or disseminated the Defamatory Email, either individually or in concert.

77. Moreover, the existence of the purported X "news" account and its activity relative to the January 16 Instagram login and January 28 Defamatory Email further support the

inference that "The Whistleblower Times" persona was developed to lend false credibility to a planned publication targeting the LaGues.

78. On September 15, 2026, Samantha, through counsel, formally notified Defendants of her claims and afforded them an opportunity to resolve the dispute without litigation. On October 2, 2026, counsel for the Forsgrens responded, disputing the significance of the Spectrum subscriber records and expressly stating that Olivia denied knowledge of or responsibility for the Defamatory Email. Notably, although counsel provided an express denial on Olivia's behalf, the response contained no corresponding denial that Eric created, accessed, controlled, contributed to, authorized, or transmitted communications through "The Whistleblower Times." Instead, Defendants' response relied on the contention that the subscriber records did not conclusively identify the particular individual operating the accounts. The parties have been unable to resolve the dispute, necessitating this action.

**G. Resulting Injuries from the Pattern of Conduct and Defamatory Email**

79. The Defamatory Email placed accusations of criminal misconduct, child endangerment, and school violence before persons who supervised or influenced Plaintiff's government employment, her husband's military community, and her child-facing volunteer work. Its selection of recipients made reputational damage and disruption of those relationships predictable and severe.

80. The publication caused damage to Plaintiff's reputation and relationships, interference with her ordinary participation in school and community activities, fear of adverse employment consequences, and substantial emotional distress. Plaintiff incurred investigation and legal expenses in order to identify the anonymous publisher and protect herself against the accusations.

81. After the January 2026 publication, Plaintiff sought medical care relating to anxiety, depression, heart palpitations, and trauma-related symptoms. She endures continuing weekly therapy and has received a diagnosis of post-traumatic stress disorder.

82. On August 14, 2026, a treating physician recommended a higher level of behavioral-health care due to Plaintiff's increased stress levels. Plaintiff thereafter began additional outpatient psychiatric treatment.

83. The sustained course of targeted hostility, culminating in the Defamatory Email, substantially contributed to Plaintiff's physical and psychiatric symptoms, continued treatment costs, and diminished ability to perform her professional duties. Her losses include monetary expenditures for treatment and investigation, lost economic opportunities to the extent shown, and other pecuniary and nonpecuniary damages.

## FIRST CAUSE OF ACTION
**(Defamation and Defamation Per Se – Against All Defendants)**

84. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

85. The Defamatory Email was circulated to numerous third parties, specifically identified Plaintiff, and falsely suggested that she had committed criminal harassment, that her children were exposed to environments involving substance abuse, and that one of her children had threatened to bring a gun to school. Its obsolete court-record screenshot reinforced the false accusation of current criminality, and the false claims that there were reports from concerned parents imparted an appearance that the invented accusations were corroborated.

86. The statements and implications were false and harmed Plaintiff's standing as a federal employee, a parent, and a school-community volunteer. The charges were particularly

injurious because the recipients included people with authority over her employment and relationships with schools and the military community.

87. Upon information and belief, one or both Defendants authored, materially contributed to, authorized, directed, procured, or distributed the Defamatory Email, and thus caused its publication to persons other than Plaintiff. They knew the identified recipients would receive and understand the allegations.

88. Defendants possessed detailed knowledge of Plaintiff's prior municipal proceedings, school and community relationships, and professional responsibilities.

89. With that knowledge, Defendants disseminated grave, yet familiar, accusations concerning drug exposure, a school firearm threat, and other alleged misconduct, presenting them as reports from multiple concerned parents supported by corroborating information while simultaneously acknowledging that the allegations had not been independently verified.

90. The Defamatory Email was distributed well beyond a direct report to the personnel responsible for a particular child-safety incident. It was sent simultaneously to Army leadership, educational and PTA contacts, and federal-employer attorneys.

91. The sender of the Defamatory Email leveraged purported unverified and fabricated allegations to attack Samantha's suitability for volunteer work, and threatened a wider media campaign.

92. The audience, packaging, and threats of imminent escalation demonstrate the purpose of the Defamatory Email was to inflict reputational damage rather than communicating a narrowly tailored safety concern.

93. Samantha has suffered harm to her reputation, diminished standing in her community and professional settings, substantial emotional distress, medical expenses,

investigation expenditures, and other monetary losses. She seeks general and compensatory damages, presumed damages to the extent permitted by law for qualifying defamatory statements, and punitive damages based on Defendants' intentional or recklessly indifferent misconduct.

**SECOND CAUSE OF ACTION**
**(False-Light Invasion of Privacy – In the Alternative Against All Defendants)**

94. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

95. By packaging false accusations with a stale municipal court image and presenting them as reports from multiple concerned parents, the Defamatory Email portrayed Plaintiff as a criminally involved and irresponsible parent who threatened the safety of schoolchildren. That portrayal materially misrepresented her conduct and character and would be highly offensive to any reasonable person.

96. The Defamatory Email was sent to an extensive, deliberately selected group spanning the Army, school administrators, PTA-connected officials, and federal-employer legal personnel, with demands for further action and threatened dissemination to local and national news organizations.

97. The allegations were subsequently circulated beyond the listed recipients, including by email forwarded to several other individuals within Picatinny Arsenal.

98. Defendants knew the purported parent reports and outdated case status were false or recklessly disregarded their falsity and the false public impression they would create.

99. The false portrayal caused serious humiliation, emotional distress, treatment expenses, and reputational injury. Plaintiff seeks damages for the consequences of that publication without double recovery.

**THIRD CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress – Against All Defendants)**

100. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

101. One or both Defendants intentionally or recklessly initiated an anonymous campaign alleging child drug exposure, a school gun threat, and criminal misconduct against a former close friend, and sent those accusations to officials positioned to control important aspects of her work and family life.

102. Defendants' conduct was not limited to the anonymous defamatory publication. Rather, the Defamatory Email was the culmination of a prolonged and escalating campaign of harassment, intimidation, and retaliation directed at Plaintiff and her family following the deterioration of the parties' former friendship.

103. This course of conduct included:

a. repeatedly lodging baseless or materially exaggerated complaints concerning trivial encounters with Plaintiff and her family;

b. making accusations of harassment to military, law-enforcement, and community authorities;

c. engaging in persistent surveillance, monitoring, and physically intimidating behavior;

d. soliciting information about Plaintiff through third parties; and

e. attempting to interfere with Plaintiff's professional responsibilities, community involvement, and family life.

104. Viewed collectively, these actions reflect a sustained and deliberate effort to disrupt Plaintiff's daily life, undermine her relationships and reputation, and subject her to

continuing fear, humiliation, and severe emotional distress, motivated by Defendants' personal animosity toward Plaintiff and her family.

105. Prior hostility and deliberate choice of recipients of the Defamatory Email demonstrate knowledge of the high likelihood that extreme emotional distress would result when Plaintiff discovered that it had been sent.

106. In combination with the extensive course of conduct leading to the Defamatory Email, the email's deliberate use of unfounded accusations of danger to children, drug use, and school violence to place a parent under suspicion before her employer and school community was extreme, outrageous, and intolerable conduct.

107. That conduct foreseeably caused Plaintiff severe emotional distress, including anxiety, depression, post-traumatic symptoms, heart palpitations, and symptoms requiring medication, weekly therapy, physician-directed higher-level care, and psychiatric treatment.

108. The severity of her condition materially affected her daily life and ability to work, and caused medical and other monetary expenses. Plaintiff seeks damages for her distress to the full extent permitted by law.

**FOURTH CAUSE OF ACTION**
**(Civil Conspiracy – Against All Defendants)**

109. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

110. Upon information and belief, Defendants Olivia Forsgren and Eric Forsgren knowingly agreed and acted in concert to publish false and defamatory statements concerning Plaintiff, with the shared objective of damaging Plaintiff's personal and professional reputation, undermining her standing within the Picatinny Arsenal community, and causing her emotional distress.

111. Defendants' agreement and coordinated conduct may reasonably be inferred from their history of complementary actions directed toward Plaintiff, their shared access to information concerning Plaintiff and her family, and their respective efforts to monitor, report, and interfere with Plaintiff's personal and community activities.

112. The inference of coordination is further supported by the Defamatory Email's detailed references to Plaintiff's personal and family circumstances, including matters involving each Defendant, suggesting that information known to both Defendants was combined in preparing the publication.

113. The subscriber records further connect the anonymous online accounts to Defendants' shared household, identifying Eric Forsgren as the subscriber and listing contact information associated with Olivia Forsgren.

114. In furtherance of their agreement, upon information and belief, Defendants took steps to prepare, facilitate, and disseminate the Defamatory Email, including by establishing or utilizing anonymous online accounts, gathering and incorporating information concerning Plaintiff, and transmitting or causing the transmission of false allegations to individuals in positions of power to adversely affect Plaintiff's employment, reputation, and standing within her community.

115. Upon information and belief, the Defamatory Email's selection of recipients reflected knowledge of Plaintiff's professional, military, and community relationships that Defendants possessed collectively through their respective positions and connections.

116. Upon information and belief, each Defendant understood the general purpose of the agreement to publish the Defamatory Email and knowingly participated in furthering that purpose.

117. Defendants' actions in furtherance of their agreement constituted or facilitated the underlying wrongful conduct alleged herein, including defamation and intentional infliction of emotional distress.

118. As a direct and proximate result of Defendants' agreement and acts undertaken in furtherance thereof, Plaintiff suffered reputational harm, emotional distress, and other damages as alleged herein.

119. Accordingly, Defendants are jointly and severally liable for the wrongful acts committed in furtherance of their agreement and the resulting damages.

## FIFTH CAUSE OF ACTION
**(Breach of August 13, 2025 Confidential Settlement Agreement – Against Olivia Forsgren)**

120. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

121. On August 13, 2025, Plaintiff and Olivia Forsgren entered a binding Confidential Settlement Agreement to resolve Olivia's municipal harassment complaint.

122. Plaintiff provided the agreed consideration, refrained from pursuing the contemplated cross-complaint, and otherwise fulfilled her duties under the Agreement.

123. The Agreement prohibited public disparagement under paragraph (a), and under paragraph (b) prohibited soliciting any third party to make defamatory or unfavorable remarks, whether publicly or privately. Paragraph (d) expressly permits the aggrieved party to seek judicial recourse, including attorneys' fees and costs.

124. New Jersey law governs the Agreement, and the parties consented to non-exclusive jurisdiction in the Superior Court of New Jersey, Morris County, for enforcement.

125. Upon information and belief, Olivia Forsgren violated the Agreement by personally participating in the creation, authorization, or publication of the Defamatory Email and/or by instructing, requesting, seeking, or eliciting its publication by another person.

126. The Defamatory Email was circulated under the guise of a media inquiry to multiple third parties to disparage Plaintiff and attack her employment, reputation, and community position.

127. Olivia Forsgren's conduct deprived Samantha of the benefit of the bargain that had resolved their dispute.

128. Olivia's breach caused Samantha monetary losses, including expenditures to investigate the anonymous campaign, respond to the accusations, obtain medical and psychiatric treatment, and protect her reputation, together with other consequential damages.

129. Samantha seeks compensatory damages for that breach and the reasonable attorneys' fees and costs expressly contemplated in paragraph (d) of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendant or Defendants proven responsible for each claim as follows:

A. Compensatory monetary damages for loss of reputation, emotional distress, medical and psychiatric care, forensic investigation, and other proven economic and noneconomic losses, in an amount to be determined at trial;

B. General and presumed damages to the extent authorized by New Jersey law for actionable defamation and defamation per se;

C. Punitive monetary damages for malicious, willful, or wantonly reckless conduct to the extent recoverable under applicable law;

D. Judgment against Olivia for breach of the August 13, 2025 Agreement, with compensatory damages and all contractual relief authorized by that Agreement;

E. Reasonable attorneys' fees and litigation costs recoverable under paragraph (d) of the Agreement or other applicable authority;

F. Prejudgment and post-judgment interest where allowed;

G. Taxable costs and disbursements; and

H. Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 19, 2026
Brooklyn, New York

**LEWIS & LIN LLC**

By: *<u>/s/ David D. Lin</u>*
David D. Lin, Esq.
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Telephone: (718) 243-9325
David@iLawco.com

*Attorneys for Plaintiff Samantha LaGue*